# 17-3434-PR

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



PAUL SCRIMO,

*Petitioner-Appellant,*

*v.*

WILLIAM LEE, SUPERINTENDENT AT GREEN HAVEN CORRECTIONAL FACILITY,

*Respondent-Appellee.*

_____

*On Appeal from the United States District Court*
*for the Eastern District of New York*

## BRIEF FOR PETITIONER-APPELLANT

RANDALL D. UNGER, ESQ.
*Attorney for Petitioner-Appellant*
42-40 Bell Boulevard, Suite 302
Bayside, New York 11361
718-279-4500

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.......................................................... iii

PRELIMINARY STATEMENT................................................. 1

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION.......................................... 2

ISSUES PRESENTED FOR REVIEW...................................... 2

STATEMENT OF THE CASE.................................................. 3

    The Trial................................................................ 3
    The Prosecution's Case................................................... 3
    The Preclusion of Defense Witnesses............................. 21
    The Verdict & Sentencing.............................................. 22
    The State Court Appeal.................................................. 22
    The Motion to Vacate the Conviction............................. 23
    The Habeas Petition........................................................ 23
    The District Court Decision............................................ 24
    The Certificate of Appealability..................................... 24

SUMMARY OF THE ARGUMENT........................................ 25

ARGUMENT:

POINT I

        THE APPELLANT WAS DEPRIVED OF HIS
        CONSTITUTIONAL RIGHT TO PRESENT A
        COMPLETE DEFENSE WHEN THE TRIAL COURT
        PRECLUDED HIM FROM PRESENTING EVIDENCE
        ABOUT THE SOLE EYEWITNESS' PRIOR BAD ACTS,
        WHICH WERE RELEVANT TO ESTABLISHING THAT
        HE WAS THE REAL MURDERER.................................... 26

POINT II

THE APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BY SEVERAL KEY OMISSIONS WHICH PREVENTED THE JURY FROM CONSIDERING SIGNIFICANT EXCULPATORY EVIDENCE..........................................................................  39

CONCLUSION............................................................................  55

CERTIFICATION

## TABLE OF AUTHORITIES

Page

Cases

*Brecht v. Abrahamson*, 507 U.S. 619 (1993)............................................. 37

*Carrion v. Smith*, 549 F.3d 583 (2d Cir. 2008)........................................ 46

*Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992)................................ 41

*Chambers v. Mississippi*, 410 U.S. 284 (1973)........................................ 28, 35, 36, 47

*Claudio v. Scully*, 982 F.2d 798 (2d Cir. 1992)....................................... 43

*Cornell v. Kirkpatrick*, 665 F.3d 369 (2d Cir. 2011)............................... 40, 45

*Cox v. Donnelly*, 432 F.3d 388 (2d Cir. 2005)......................................... 46

*Crane v. Kentucky*, 476 U.S. 683 (1986)................................................. 29, 38, 47

*Cullen v. Pinholster*, 563 U.S. 170 (2011)............................................... 40

*Davis v. Alaska*, 415 U.S. 308 (1974)...................................................... 30

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)....................................... 30

*Estelle v. McGuire*, 502 U.S. 62 (1991)................................................... 36

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003)....................................... 41

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2006)................................ 53

*Greene v. McElroy*, 360 U.S. 474 (1959)................................................. 30

iii

*Harrington v. Richter*, 562 U.S. 86 (2011)................................................. 28, 41

*Hawkins v. Costello*, 460 F.3d 238 (2d Cir. 2006)................................... 31

*Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005)............................................ 53

*Henry v. Scully*, 78 F.3d 51 (2d Cir. 1996)............................................. 42

*Henry v. Speckard*, 22 F.3d 1209 (2d Cir. 1994)................................... 30

*Holmes v. South Carolina*, 547 U.S. 319 (2006)..................................... 38

*Kotteakos v. United States*, 328 U.S. 759 (1946)................................... 37

*Lafler v. Cooper*, 566 U.S. 156 (2012)..................................................... 27

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001)................................... 42

*Lockhart v. Fretwell*, 506 U.S. 364 (1993)............................................... 42

*Lockyer v. Andrade*, 538 U.S. 63 (2003).................................................. 28

*Montana v. Egelhoff*, 518 U.S. 37 (1996)................................................. 29

*Murray v. Carrier*, 477 U.S. 478 (1986)................................................... 41

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001)........................................ 54

*People v. Alvino*, 71 N.Y.2d 233 (1987).................................................. 43

*People v. Carroll*, 95 N.Y.2d 375 (2000)................................................. 29

*People v. Carter*, 77 N.Y.2d 95 (1990).................................................... 44

*People v. DiPippo*, 27 N.Y.3d 127 (2016)............................................... 31, 44

*People v. Dlugash*, 41 N.Y.2d 725 (1977)............................................... 51

iv

*People v. Dorcinvil*, 122 A.D.3d 874 (2d Dept. 2014)............................. 34

*People v. Gallo*, 12 N.Y.2d 12 (1962)...................................................... 51

*People v. Gissendanner*, 48 N.Y.2d 543 (1979).................................... 30

*People v. Gross*, 26 N.Y.3d 689 (2016)................................................. 34

*People v. Hudy*, 73 N.Y.3d 40 (1988)............................................... 30, 34

*People v. Jackson*, 39 N.Y.2d 64 (1976)............................................... 43

*People v. Lopez*, 71 N.Y.2d 662 (1988)................................................. 47

*People v. Molineux*, 168 N.Y. 264 (1901)............................................. 43

*People v. Pavao*, 59 N.Y.2d 282 (1983)........................................... 37, 38

*People v. Pitt*, 84 A.D.3d 1275 (2d Dept. 2011)................................... 52

*People v. Primo*, 96 N.Y.2d 351 (2001)................................................ 31

*People v. Robinson*, 89 N.Y.2d 648 (1997)........................................... 28

*People v. Rodriguez*, 188 A.D.2d 566 (2d Dept. 1992)........................ 51

*People v. Scrimo*, 14 N.Y.3d 805 (2010)............................................... 23

*People v. Scrimo*, 15 N.Y.3d 778 (2010)............................................... 23

*People v. Scrimo*, 67 A.D.3d 825 (2d Dept. 2009)................................ 22

*People v. Till*, 87 N.Y.2d 835 (1995)..................................................... 44

*People v. Vails*, 43 N.Y.2d 364 (1977)................................................... 44

*People v. Williams*, 81 N.Y.2d 303 (1993)............................................ 46

v

*People ex rel. Perkins v. Moss*, 187 N.Y. 410 (1907)................................ 51

*Pointer v. Texas*, 380 U.S. 400 (1965)..................................................... 47

*Quartararo v. Fogg*, 679 F.Supp. 212 (E.D.N.Y.), *aff'd.*
   849 F.2d 1467 (2d Cir. 1988)........................................................... 41

*Rivas v. Fischer*, 780 F.3d 529 (2d Cir. 2015).......................................... 41

*Rock v. Arkansas*, 483 U.S. 44 (1987)........................................... 29, 37

*Strickland v. Washington*, 466 U.S. 668 (1984)....................................... *passim*

*Taylor v. Illinois*, 484 U.S. 400 (1988).................................................... 28

*United States v. Scheffer*, 523 U.S. 303 (1998)........................................ 29

*Washington v. Texas*, 388 U.S. 14 (1967)................................................ 47

*Webb v. Texas*, 409 U.S. 95 (1972).......................................................... 28

*Williams v. Taylor*, 529 U.S. 362 (2000)................................................. 28

Statutes & Other Authorities

U.S. Const., Amend. V............................................................................ 47

U.S. Const., Amend. VI........................................................................... *passim*

U.S. Const., Amend. XIV......................................................................... 28

28 U.S.C. § 2254................................................................................... *passim*

28 U.S.C. § 1291................................................................................... 2

N.Y. Criminal Procedure Law § 440.10.................................................. 23

vi

N.Y. Criminal Procedure Law § 470.25(1)................................................. 23

N.Y. Penal Law § 125.25(1)....................................................................... 1, 22

*Fisch on New York Evidence*, 2d ed. (1977)............................................. 29

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
----------------------------------------------------x
PAUL SCRIMO,

                         Petitioner-Appellant,

    -against-

WILLIAM LEE, Superintendent,
Green Haven Correctional Facility,

                         Respondent-Appellee,

----------------------------------------------------x

## PRELIMINARY STATEMENT

        Paul Scrimo (hereinafter "appellant") appeals from an order filed on September 29, 2017 in the United States District Court for the Eastern District of New York, denying his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Hon. Ann M. Donnelly). In his petition, he challenged the constitutionality of a judgment of the County Court, State of New York, Nassau County, rendered June 18, 2002, convicting him, after a jury trial, of the crime of murder in the second degree, in violation of N.Y. Penal Law § 125.25(1), and sentencing him to an indeterminate term of imprisonment of 25 years to life (Hon. Jeffrey S. Brown, at trial and sentencing). The appellant remains incarcerated pursuant to that judgment of conviction.

1

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an appeal from an order rendered September 29, 2017, in the United States District Court for the Eastern District of New York, denying the appellant's petition for a writ of habeas corpus and disposing of all of his claims. The district court's jurisdiction was based on 28 U.S.C. § 2254. In an order filed March 16, 2018, the United States Court of Appeals for the Second Circuit granted the appellant a certificate of appealability on several of his claims. This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

### POINT I

Whether the appellant was deprived of his constitutional right to present a complete defense when the trial court precluded him from presenting evidence about the sole eyewitness' prior bad acts, which were relevant to establishing that he was the real murderer.

### POINT II

Whether the appellant was denied his constitutional right to effective assistance of trial counsel as a result of his failure to present arguments that would have enabled the jury to consider crucial items of evidence supporting an acquittal.

2

## STATEMENT OF THE CASE

The Trial

The Prosecution's Case

John Williams, a brother of the deceased, Ruth Williams, described his sister as a "neat freak" who "didn't take crap from anybody". Physically, she was between 5'7" and 5'8", weighed about 170 pounds and was 48 years old at the time of her death (347-356).[1]

William Nimmo owned a florist shop in Bethpage, Long Island where Ruth Williams had worked since 1992 (357-360).

Caroline Daly, another employee at Nimmo's florist shop, reported to work on April 13, 2000 and learned that Ruth Williams had not been at the shop for two days. She sent a delivery man to her home to check on her and then attempted to contact her landlord to make inquiry (360-365).

Daly recalled speaking to a detective on April 14, 2000, but did not recall telling him that Williams had told her that she had complained about a police officer who was stalking her. Nor did she recall telling the detective that Williams had "showed up drunk" at the shop after "a guy she had put in jail just got out and had

---

[1]Numerical references preceded by an "A" are to the Appendix submitted herewith. Those with no prefix are to the transcript of the trial.

3

left a note on her car". However, she did recall Williams telling her that she had dated a man named John and that on one occasion, she had been involved in a fight in a bar with John's brother (365-375).

Thomas Hardman was a bartender at Y.L. Childs, a bar at the corner of Main Street and Conklin Street in Farmingdale, Long Island. On April 11, 2000, he left that bar at about 7:30 p.m. and then socialized at two other bars before returning to Y.L. Childs at about 1:00 a.m. Later that morning, Ruth Williams, whom he had known for several years, arrived at the bar accompanied by John Kane and another man, whom he had seen playing darts once before, and whom he described as about 5'9", stocky, with a shaved head and tattooed arms. Both men were drinking with Williams but Hardman didn't see her kiss either of them. When Hardman was unable to find his keys, the owner of the bar locked the door and questioned customers to see if anyone had them. Williams left the bar by herself at about 4:00 a.m. Though he claimed that Kane and the other man left about 10 to 15 minutes later, he admitted that he had testified in the grand jury that he hadn't seen either man leave the bar. At a lineup held on May 3, 2000, Hardman identified the appellant as the second man who was in the bar with Williams on the morning in question (390-419).

Frank DeFalco was the owner of a bar called Falcons Nest. Every Tuesday night, teams of dart players competed at his bar. Among those players were

the appellant and John Kane, whom he knew as John Doe. On April 11, 2000, the dart tournament ended before midnight. Kane and the appellant remained in the bar when DeFalco left (419-439).

Melissa Notarnicola was another bartender at Y.L. Childs but was there as a customer during the early morning hours of April 12, 2000. She recalled that Ruth Williams was in the bar at about 2:00 or 3:00 a.m. and was dancing seductively and appeared to be "a little drunk". She also recalled that Williams was with John and a man with a shaved head and tattoos, whom she was kissing and "dancing on top of him". When Thomas Hardman lost his keys, everyone in the bar was forced to remain while the keys were searched for. Eventually, Williams left the bar. But she wasn't sure if she left alone or with one of the men who'd been with her (440-448).

Penny Shouse was working as a bartender at Granny O'Shea's, another bar in Farmingdale, Long Island on April 12, 2000. At about midnight, Ruth Williams arrived, followed by a man wearing a toupee who spoke with her at the bar for about 15 minutes. After Williams left, she observed John Kane and another man with a shaved head and tattooed arms drinking at the bar until about 1:00 a.m. when they left (449-454, 477-478).

Shouse did not recall if she was using cocaine on either April 11 or April 12, 2000. And she never observed Ruth Williams use cocaine. But when asked if

5

John Kane was supplying her with cocaine during that period of time, the trial court sustained the prosecutor's objection to that inquiry (454-477).

Gerard Connell, a records custodian for Verizon Communications, produced Ruth Williams' phone records for April 12, 2000. Those records showed that on that date, a call was made to directory assistance at 4:00 a.m. (480-493).

Francine Quinn was working as a bartender at the Downtown Bar and Grill, a bar on Main Street next to Captain Andy's, another Farmingdale bar, during the early morning hours of April 12, 2000. She recalled that Ruth Williams entered the bar and drank a beer with a thin white male with dark hair, though she had described that man in the grand jury as "a little stocky" with a "big chest" and "big arms" with tattoos. By the time Quinn left the Downtown Bar and Grill, Williams had already left. When Quinn then entered Y.L. Childs, she observed Williams with John Kane and a man with "really short hair" and tattoos whom she was kissing (497-503, 515-517, 552-553).

Quinn left Y.L. Childs with her roommate James Grella at about 4:00 a.m. and was walking through a parking lot when, from a distance of about 50 feet, she heard loud voices and observed Williams, who was standing near the entrance to her apartment, arguing with a man whom she believed was the same man who was kissing her earlier (503-512, 522-536, 553-562, 590-593).

6

On May 3, 2000, Quinn viewed a lineup, but did not identify anyone in it because "[a]ll the people in the lineup looked the same". However, the following day, she saw a newspaper story with a photo of a detective and the appellant and recognized the appellant as the man she had seen with Williams at Y.L. Childs on April 12, 2000 (512, 562-563, 593-595).

Quinn acknowledged that she was arrested on August 1, 2001 for selling and possessing narcotics. However, when asked if she knew that John Kane sold narcotics and was banned from a bar for engaging in such activities, the trial court sustained the prosecutor's objections to that line of inquiry (566-588).

Sven Bost owned the building which housed a restaurant called Captain Andy's and had rented an apartment above the restaurant to Ruth Williams since 1992. On April 13, 2000, after he was unable to make contact with Williams, he phoned the police. When he and an officer entered the apartment, they observed Williams lying on the floor next to her bed (603-613).

Det. Dennis Downes, assigned to the Nassau County Police Department Crime Scene Unit, responded to Ruth Williams' apartment at 196 Main Street on April 13, 2000. He observed Williams' body in the bedroom and a telephone cord wrapped around her neck. He observed no signs of forced entry and no evidence of ransacking. He photographed and video recorded the exterior and interior of the

apartment, dusted various items for latent fingerprints and collected various items including cigarette butts, a compact disc case, a photo album, a beer bottle, a drinking glass and bed sheets and pillowcases for further testing (617-701).

Det. Charles Costello, assigned to the Nassau County Police Department Latent Fingerprint Section, examined the latent fingerprints lifted by Det. Downes. He determined that a drinking glass contained Ruth Williams' fingerprint; that a compact disc case contained John Kane's fingerprint and that a photo album contained the fingerprints of John Marks and Steven Schwartz (701-722).

Dr. Gerard Catanese, a forensic pathologist employed by the Nassau County Medical Examiner's Office, performed an autopsy on the body of Ruth Williams on April 14, 2000. He observed that there was a cord tied around her neck, bruises on her tongue and neck, hemorrhages in her eyes and eyelids and an abrasion on her neck. Internally, she had bruises on her neck muscles and scalp and fractures to her neck bones and larynx. He concluded that her cause of death was manual strangulation. And from tissues samples that were tested, he determined that Williams had a blood alcohol level of .26 percent at the time of her death (724-768).

Dr. Thomas Manning, a toxicologist employed by the Nassau County Medical Examiner's Office, believed that for a woman weighing 165 pounds, as Williams did, she would have had to consume at least 10 alcoholic drinks to have a

.26 percent blood alcohol level, and that at such a level, her judgment, coordination and reaction time would be greatly impaired (773-789).

Det. Vito Schiraldi, assigned to the Nassau County Police Department Scientific Investigation Bureau, examined the clothing Ruth Williams was wearing at the time of her death. The only human hairs he found on her clothing were hers (792-806).

Schiraldi also examined a Leatherman tool which had a black plastic fragment on its interior handle. He determined that the fragment did not originate from the cord that had been tied around Williams' neck. But he believed that the cord had been cut with some type of shearing instrument and that the Leatherman tool was just such an instrument. However, he could not say that the cord had actually been cut with the Leatherman tool (806-927).

Carlo Rosati, a firearm and tool marks examiner employed by the FBI, also examined the Leatherman tool and the cut portion of the cord found around Williams' neck. He also concluded that the Leatherman tool could have made that cut, but could not "say definitively" that it did (927-947).

Det. Kevin McCarthy, assigned to the Nassau County Police Department Scientific Investigation Bureau, sent four cigarette butts, swabs from a beer bottle, a drinking glass and a black cord, a blood sample and three fingernail clippings taken

from Ruth Williams, a blood sample taken from the appellant and an oral swab taken from John Kane to LabCorp, a laboratory that performed DNA testing. After those items were returned to him, he examined the fingernail clippings for traces of blood and seminal fluid but found none (950-1007).

Meghan Clement, a forensic director at LabCorp, received the items that were sent to her laboratory by Det. McCarthy and conducted DNA tests on them. Two of the cigarette butts, one of the fingernail clippings and a drinking glass contained DNA consistent with Ruth Williams' DNA profile. Two of the cigarette butts contained DNA consistent with John Kane's DNA profile. One of the fingernail clippings contained a DNA mixture that could not exclude Williams or Kane from being a contributor. And a beer bottle contained a DNA mixture that could not exclude Williams, Kane or the appellant as a contributor (1077-1088).

Lisa Lawson was the manager of the 7-Eleven store at 150 North Main Street in Farmingdale, Long Island. Mohammed Hussain was working at that store on the morning of April 12, 2000. On that date, at 4:14 a.m., he recorded a sale of a 12-pack of Coors Light beer bottles, a pack of Vantage Ultra Light cigarettes and a pack of Marlboro cigarettes (1088-1095).

Det. Robert Dempsey, assigned to the Nassau County Police Department Homicide Squad, assisted in the arrest of the appellant during the early morning hours

10

of May 3, 2000. After the appellant was arrested in a parking lot facing Elizabeth Gardens, an apartment complex, he was driven to police headquarters. When the appellant asked why he was being arrested, Det. Dempsey informed him it was for a murder. And when the appellant replied that he couldn't have committed any murders that night because he'd been playing darts in a bar, Det. Dempsey informed him that his arrest was for the murder of a woman three weeks earlier. The appellant then stated that he "knew her from town but ... had nothing to do with it". Det. Dempsey then administered *Miranda* warnings to him and turned him over to Det. McHugh for interrogation (1098-1113).

Det. John McHugh, also assigned to the Nassau County Police Department Homicide Squad, interviewed John Kane at his home on April 15, 2000. Kane, who had an injury on his head that was "scabbed over", was about 5'8", 150 pounds and had a pony tail and a full beard. Det. McHugh was aware that Kane was "known in bars" but was unaware if Ruth Williams owed him any money. And when asked if he knew that Kane sold cocaine, or if any of the people he interviewed in connection with his investigation had stated that Kane sold drugs, the trial court sustained all objections to those questions. On April 20, 2000, at about 4:00 p.m., he happened to observe and make eye contact with the appellant at the corner of Front Street and Main Street in Farmingdale. Later that day, he was informed that the

11

appellant had phoned his office. He then phoned the appellant who told him that he understood he was "looking to speak to a big, bald-headed guy that was out at Y.L. Childs on Tuesday night". When Det. McHugh acknowledged that he was, the appellant agreed to meet with him in a command bus parked behind Captain Andy's (1114-1140, 1200-1208, 1220-1223, 1237-1238, 1268-1271).

Det. McHugh invited the appellant inside the command bus at about 5:15 p.m. and questioned him. The appellant stated that he stayed out late on the night in question; that he shot darts at Falcons Nest until about midnight; that he then went to Granny O'Shea's; that he drank vodka and seltzer that night; that he went to Y.L. Childs at about 2:00 a.m.; that he knew Ruth Williams as "Ruthless, a nickname which a number of people called her"; that she and he were drinkers; that a friend of his had told him that she was "into witchcraft" and "turned tricks"; that he thought she was attractive and outspoken; that he conversed with her at Y.L. Childs on the morning in question; that he couldn't remember what they discussed, and that he left that bar at about 3:00 a.m. and walked straight home. When the questioning concluded, Det. McHugh permitted him to leave (1139-1145, 1223).

Det. McHugh interviewed John Kane a second time on May 2, 2000, at about 7:00 p.m., at police headquarters in Mineola, Long Island. During that interview, Kane provided him with a DNA sample. The appellant was arrested the

12

following day. When Det. McHugh met him at his office, the appellant stated, "[y]ou got the wrong guy, it's a mistake". He then recounted his activities on the morning of April 12, 2000 as he had done before. However, when he was told that some of the establishments he visited that day had surveillance cameras, he became nervous and stated that he had gone to a 7-Eleven to buy beer and cigarettes to take home. When Det. McHugh and his partner accused him of lying, the appellant admitted that he had kissed Williams. When the detectives again accused him of lying and informed him that he was a suspect, the appellant suggested they speak to John (1147-1155, 1214-1220, 1223-1233, 1238-1244).

After a 45 minute break, the interrogation resumed at about 4:20 a.m. At that session, the appellant told the detectives that he did not have a relationship with Ruth Williams and that John Kane was an alcoholic whom he knew "from the bar". After another pair of detectives interrogated him, Det. McHugh and his partner returned at about 7:00 a.m. During this session, when the detectives advised him to tell the truth, the appellant replied that "his son had spoken to the police and had told them the truth and his son wound up in jail." When he then stated that he wanted an attorney "to tell his side of the story", the questioning ended (1155-1158).

Det. McHugh conducted a lineup with the appellant later that day. Francine Quinn viewed the lineup but did not identify anyone in it. However, the

13

next day, when Quinn saw a photograph of the appellant and Det. McHugh in a story published in the newspaper Newsday, she contacted him and advised that she recognized the appellant as the man who had left Y.L. Childs with Ruth Williams and as the man whom she observed at the back door of Williams' apartment (1164-1167, 1244-1245, 1248-1260, 1263-1266).

Det. Brian Parpan, also assigned to the Nassau County Police Department Homicide Squad, took a phone call from the appellant on April 20, 2000 and then contacted Det. McHugh to call him back. Later that day, the appellant again phoned Det. Parpan and informed that he recalled that a man whose photo Det. McHugh had just shown him was someone he saw on a daily basis when he dropped his son off at school (1272-1276).

Det. Parpan participated in the appellant's interrogation on May 3, 2000 and reiterated Det. McHugh's testimony regarding the statements elicited. He added that when he was asked whether Ruth Williams and John Kane had a relationship, the appellant replied, "I'm not going to talk about other people". And when asked whether Williams had made a remark that upset him, the appellant replied, "I can't help you with this. We are on different sides here" (1277-1294, 1299-1309).

Mohammed Hussain, a sales clerk at the 7-Eleven store at 150 North Main Street in Farmingdale, recalled that Ruth Williams regularly purchased Coors

Light and Budweiser beer, and Vantage Ultra Light 100 cigarettes. He was also acquainted with the appellant, who regularly purchased a newspaper and Marlboro Light cigarettes, and his wife, who regularly purchased the same cigarettes and coffee (1310-1314).

Hussain was working on April 12, 2000 when the appellant entered at about 4:00 a.m. and purchased a 12-pack of Coors Light beer, a pack of Marlboro Light cigarettes and a pack of Vantage Ultra Light 100 cigarettes. When Hussain asked, "you buy for the blond lady", the appellant replied that he was, but that he shouldn't tell his wife. After the appellant paid for the items, Hussain asked if he wanted a condom and then handed him one (1317-1319, 1331, 1342-1344).

Det. James Cereghino, also assigned to the Nassau County Police Department Homicide Squad, proceeded to the vicinity of the appellant's home to effect an arrest on the night of May 2, 2000. Shortly after midnight, when he saw the appellant exit a bar, he confronted him at gunpoint and ordered him to lie on the ground. After the appellant was handcuffed, a pouch attached to his belt was found to contain a Leatherman tool. He was then driven to the police station (1357-1363).

When Det. Cereghino was asked to interrogate the appellant by Det. McHugh, he entered the room, accompanied by Det. Cole, and apologized to the appellant for pointing a gun at his face. During this interrogation, the appellant

15

described his movements on the morning in question and denied being in Ruth Williams' apartment at that time, though he acknowledged that it was possible that he had gone there but was too drunk to remember. When Det. Cereghino informed him that John Kane had been at the police station for several hours and that "[w]e know what happened in the apartment that night", the appellant became sullen and withdrawn and the interrogation ended (1363-1366, 1374-1377).

P.O. Pamela Stark, a patrol officer assigned to the 8th Pct. in the Nassau County Police Department, responded to 196 Main Street on the night of April 13, 2000 and was escorted to Ruth Williams' apartment by Sven Bost. When she entered the apartment, she observed Williams lying dead, with a cord around her neck. She then searched the apartment and notified detectives (1385-1400, 1409-1414).

On October 18, 2000, P.O. Stark and her partner responded to a call of a disturbance at 25 Elizabeth Street. When they arrived at that building, the appellant was pacing in the lobby. When he exited the building, P.O. Stark asked for his name. The appellant then raised his hands over his head and replied, "Paul Scrimo. I didn't do it. John Kane did. I was never in the apartment". When her partner then asked why they'd been called there, the appellant stated that there was an Hispanic man who had been at the rear of the building; that he had confronted the man in the parking lot because he had said something rude to his wife, and that the man had flicked a

16

cigarette at him before leaving the area. The appellant then told P.O. Stark that he, Kane and Williams were at Y.L. Childs on the morning in question; that Williams "was kissing on him but only to whisper in his ears that she wanted drugs from Kane"; that "Kane is a drug dealer" and "doesn't give away drugs for free"; that Kane went with Williams to her apartment while he purchased beer and cigarettes; that he gave Kane the beer and cigarettes in an alley, and that he then went home, knowing that his wife would be angry at him. He added that he "never mentioned Kane because of the drugs" and that he was sorry for what happened to Williams (1400-1409, 1414, 1419).

When asked if the appellant told her "anything else about the – the crime – the crime that you have described here?"; whether he told her "other things he was thinking about this case?" and whether "there [was] more information that he imparted" to her about the case, the trial court sustained the prosecutor's objections to those inquiries, ruling that it would not permit him "to introduce self-serving statements of your client through this witness" (1415-1422).[2]

John Kane, who was known by the nickname "John Doe", was a "heavy drinker" who frequented bars, while performing "odd jobs" and borrowing money

---

[2]A police report documenting the entire statement the appellant made to P.O. Stark is included in the Appendix submitted herewith (A4).

17

from people in order to support himself during the time period in question. He denied that he sold drugs during that time period and specifically denied selling drugs to Stephanie Domaradzki, Charles Ball and Jennifer Hartman. And during that same time period, he belonged to a dart team that competed on Tuesday nights at the Falcons Nest bar (1426, 1465-1471, 1521-1523).

On April 11, 2000, his team, which included the appellant, competed in a dart game at Falcons Nest from 8:00 p.m. to midnight. During that game, he drank vodka and the appellant drank Guiness stout. From there, he and the appellant went to Granny O'Shea's where they drank until about 1:00 a.m. They then walked to Y.L. Childs where they drank and talked. At some point, Ruth Williams, whom Kane had known for about two years and had performed oral sex on him at her apartment approximately five times, approached and began dancing, flirting and "making out with him". And when the appellant asked, "what about me", Williams replied, "oh, you're married" (1426-1431, 1616-1620).

Williams had already left Y.L. Childs when Kane and the appellant left at about 3:45 a.m. As they walked down Main Street, Kane suggested to the appellant that they go to Williams apartment to have a drink. They then walked up to Williams' apartment, knocked on her door and were let in. When Kane asked Williams if she any beer, she replied that she didn't. The appellant then agreed to go

18

to the nearby 7-Eleven to purchase beer and a pack of cigarettes that Williams requested (1430-1431).

After the appellant left the apartment, Williams began performing oral sex on Kane while he was seated at the kitchen table. After a while, Kane asked her to stop because he knew the appellant would soon return. He then walked into the living room and began playing music from a compact disc he inserted in a stereo system. After the appellant returned with a 12-pack of beers, the three sat in the kitchen. Williams and the appellant were conversing while Kane "started vegging out to the music". He then heard the appellant say, "I'm not going to take this. I'm out of here". As the appellant headed for the door, Kane tried to persuade him to stay. Williams then said, "Fuck it. Let him go home to his fat ugly wife." He claimed that the appellant then "snapped", pushed him aside, grabbed Williams by her shoulders and threw her on the bedroom floor. He claimed that as the appellant was on top of her, he tried to get him off her and saw that he was strangling her. As Kane backed away, he heard a snapping noise after the appellant entered the bedroom. He claimed that the appellant then returned to where Williams was lying, wrapped a cord around her neck and yanked it (1431-1437, 1475, 1574-1600, 1606-1610, 1622-1625).

When the appellant screamed to shut off the stereo, Kane complied. The appellant then wiped the kitchen table and chairs with a napkin and rag. When the

19

appellant screamed, "get the beers",  Kane took the beer bottles from the table and headed for the door, followed by the appellant who wiped the door handle before leaving the apartment.  As they walked towards Kane's apartment, the appellant allegedly said, "don't say nothing.  It's all taken care of.  We are in this together.  Just keep your mouth shut" (1438-1439, 1443-1444, 1476-1477, 1600-1605).

The following Tuesday, Kane spoke to the appellant at their weekly dart game and the appellant told him, "keep your mouth shut, it's all taken care of".  One week later, the appellant told him "something about the cops were looking for a black guy and that Ruthy was seen having an argument with somebody by the Downtown [bar]" (1439-1440, 1444, 1479-1481, 1492-1493).

Kane was not sure when he first spoke to Det. McHugh about Williams.  But when he did first speak with the detective, he did not remember if he told him that he knew about the murder, or whether he and Williams had ever engaged in sexual encounters.  He did remember telling the detective that he didn't know a white man who had a shaved head and tattoos (1481-1484, 1492).

On May 2, 2000, detectives picked him up and took him to police headquarters for further questioning.  When asked if he told the detectives on that occasion about his "prior problems with the law", the trial court restricted such inquiries to whether he had ever been convicted of a crime.  When he was then asked

if he had been convicted of a felony or a misdemeanor, he replied, "Yes .... Upstate",

but with no further elaboration permitted. And when asked by detectives if he knew

a "big bald guy with tattoos", he again told them that he did not know such a person

but could not remember anything that he might have told them about the appellant.

However, he did remember that when the detectives informed him they had evidence

connecting him to the crime scene, he told them "the full story" (1493-1502, 1507-

1518, 1524-1539, 1555-1572).

The Preclusion of Defense Witnesses

After the prosecution rested its case, defense counsel advised the trial

court that he intended to call a number of witnesses, including Charles Ball and

Jennifer Hartman, who would testify that John Kane was a drug dealer; that he had

sold drugs to them; that he had sold drugs to Ruth Williams, and that he had choked

a woman during a drug dispute. When directed to give an offer of proof, he explained

that his purpose in calling those witnesses was not to impeach Kane's credibility, but

to show his relationship with Williams so that he could then argue to the jury that

Kane had a motive to murder Williams as a result of what was essentially, a drug deal

"gone bad". After considering his arguments and those presented by the prosecutor

in opposition, the trial court precluded the defense from calling those witnesses. The

defense then rested without calling any witnesses (1627-1650).

21

The Verdict & Sentencing

The jury found the appellant guilty of murder in the second degree, in violation of N.Y. Penal Law § 125.25(1) [intentional murder] (1845) and on June 18, 2002, he was sentenced to an indeterminate term of imprisonment of 25 years to life.

The State Court Appeal

The appellant appealed his judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Department.  In the brief filed with that court, his attorney raised eight claims: that the police lacked probable cause for the arrest; that improper testimony was allowed regarding the police interrogation of the appellant; that tool mark evidence suggesting that a tool possessed by the appellant was used to cut the cord with which Ruth Williams was strangled was improperly admitted; that testimony that John Kane sold drugs and had choked a customer was improperly excluded; that trial counsel was ineffective for failing to object to certain jury instructions; that the trial prosecutor engaged in misconduct during his closing argument; that trial counsel was generally ineffective in his conduct of the defense, and that the verdict was against the weight of the evidence.

The Appellate Division affirmed the appellant's conviction in a decision and order dated November 10, 2009.  *People v. Scrimo*, 67 A.D.3d 825 (2d Dept. 2009) (A33).  In a certificate dated March 29, 2010, his application for leave to

appeal to the New York Court of Appeals was denied by the Honorable Susan Phillips Read. *People v. Scrimo*, 14 N.Y.3d 805 (2010) (A35). And his application for reconsideration of his leave application was denied by Judge Read in a certificate dated July 30, 2010. *People v. Scrimo*, 15 N.Y.3d 778 (2010 (A36).

The Motion to Vacate the Conviction

In a *pro se* motion filed with the trial court on September 21, 2010, the appellant sought to vacate his conviction pursuant to N.Y. Criminal Procedure Law § 440.10. He argued that he had been denied his right to a meaningful appeal; that he was actually innocent of the charged crime, and that N.Y. Criminal Procedure Law § 470.25(1), which provides that "[a]n order of an intermediate appellate court which affirms a judgment, sentence or order of a criminal court need only state such affirmance", was unconstitutionally vague.

In an order filed November 24, 2010, appellant's motion to vacate his conviction was denied (A39). And his application for leave to appeal the denial of his motion was denied by the Honorable Leonard B. Austin, a justice of the Appellate Division, Second Department, in a decision and order dated May 10, 2011 (A41).

The Habeas Petition

In a *pro se* petition filed in the United States District Court for the Eastern District of New York on August 26, 2011, the appellant sought a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. In support, he raised all of the claims he had previously presented on his direct appeal and his motion to vacate his conviction in the state court (A8-A87).

The District Court Decision

In a memorandum, decision and order filed September 29, 2017, United States District Judge Ann M. Donnelly denied the appellant's petition in its entirety and denied him a certificate of appealability ("COA"). With respect to the evidence preclusion claim, Judge Donnelly concluded that the trial court had acted within its discretion because the proposed evidence was collateral. Moreover, even if exclusion of the evidence amounted to constitutional error, Judge Donnelly further concluded that any such error was harmless. As to the ineffective assistance of trial counsel claim, Judge Donnelly concluded that the appellant had not met his burden of establishing ineffectiveness under the stringent standards of *Strickland v. Washington*, 466 U.S. 668 (1984) (A186-A210).

The Certificate of Appealability

In an order filed March 16, 2018, this Court granted the appellant a COA on two issues: whether the appellant was denied his constitutional right to present a complete defense by the trial court's exclusion of evidence about John Kane's bad acts, which were relevant to establishing that he was the real murderer, and whether

trial counsel rendered ineffective assistance by his failure to argue that evidence of Kane's bad acts was admissible to prove his motive and opportunity to commit the murder; his failure to argue that the exclusion of that evidence violated the appellant's right to present a complete defense, and his failure to argue that the trial court should have required the prosecution to introduce the entirety of a statement made by the appellant to a police officer several months after his arrest.

## SUMMARY OF THE ARGUMENT

The appellant sought to advance the defense that John Kane was a drug dealer who strangled and killed Ruth Williams over a drug dispute and then falsely accused the appellant of committing that crime. However, throughout the trial, the trial court precluded the appellant from eliciting testimony regarding Kane's drug dealing and Williams' use of drugs, erroneously ruling that such questions were merely efforts to impugn Kane's credibility. Worse, the trial court even precluded the appellant from eliciting testimony that on one occasion, Kane had strangled one of his customers because she refused to pay him for the drugs she purchased from him. These rulings, which effectively prevented the defense from establishing that Kane was the real murderer, denied the appellant his fundamental right to present a complete defense and his due process right to a fair trial.

25

The appellant's right to a fair trial was further compromised by the conduct of defense counsel who failed to present cogent arguments that evidence of Kane's drug dealing was admissible to show that he had the motive and opportunity to murder Williams, and that precluding such evidence impaired the appellant's right to present a complete defense. Coupled with his failure to argue that a statement the appellant made to a police officer should have been admitted in toto, it is clear that the appellant was denied his right to effective assistance of trial counsel.

## ARGUMENT

### POINT I

THE APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO PRESENT A COMPLETE DEFENSE WHEN THE TRIAL COURT PRECLUDED HIM FROM PRESENTING EVIDENCE ABOUT THE SOLE EYEWITNESS' PRIOR BAD ACTS, WHICH WERE RELEVANT TO ESTABLISHING THAT HE WAS THE REAL MURDERER.

The sole eyewitness who accused the appellant of strangling and killing Ruth Williams was John Kane, an admitted alcoholic who denied that he knew anything about the crime when he was first questioned by the police and did not implicate the appellant until he was picked up by detectives and questioned almost three weeks after Williams was murdered. Given the importance of Kane's

testimony, and his admission that he had engaged in sexual encounters with Williams during the two-year period leading up to her murder, it was imperative that defense counsel be given every opportunity to show that Kane had a motive and opportunity to murder Williams, and that his accusation of the appellant was part of a scheme to shift responsibility away from himself. To accomplish that goal, defense counsel made repeated attempts, through cross-examination of prosecution witnesses, and proffering defense witnesses, to show that Kane was a drug dealer who sold narcotics to a number of customers, including Williams, and that on one occasion, he had strangled a customer over a drug payment dispute. However, the record reflects that at virtually every stage, the trial court thwarted defense counsel's efforts and precluded him from introducing such evidence. Those rulings denied the appellant his constitutional right to present a complete defense and warrant habeas relief.

Pursuant to 28 U.S.C. § 2254(d), a petitioner seeking federal habeas relief is required to show that the state court decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Lafler v. Cooper*, 566 U.S. 156 (2012). For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to dicta, of [the Supreme] Court's decisions at of the time of the

27

relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court's decision is "contrary to" or an "unreasonable application of" clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule, but unreasonably applies it to the facts of the petitioner's case. *id*. at 412-13; *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). Moreover, to establish that a decision is an unreasonable application, it must be shown that the state court decision was "objectively unreasonable". *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

   The clearly established law applicable to the appellant's preclusion of evidence claim is the constitutional right to present a defense. As the Supreme Court has noted, few rights are more fundamental than that of an accused to present evidence in his own defense. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Indeed, the right to present a defense has been characterized as one of the "minimum essentials of a fair trial." *id*. at 294. *see also Webb v. Texas*, 409 U.S. 95 (1972); *Taylor v. Illinois*, 484 U.S. 400 (1988); *People v. Robinson*, 89 N.Y.2d 648, 652-53 (1997). As the Supreme Court has held, "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation

28

clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

Of course, the right to present a defense is not absolute. As the Supreme Court would later hold, "*Crane* does nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a 'valid' reason, as it has been by Montana". *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (holding that the State's statutory ban on having a jury consider evidence of voluntary intoxication did not undermine any fundamental principle of justice). Thus, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). However, a trial judge's discretion in making evidentiary rulings "is circumscribed by the rules of evidence and the defendant's constitutional right to present a defense." *People v. Carroll*, 95 N.Y.2d 375, 385 (2000). And the restrictions that exclude evidence may not be "arbitrary or disproportionate to the purposes they are designed to serve." *Rock v. Arkansas*, 483 U.S. 44, 55-56 (1987).

Moreover, "[t]he right to cross-examine witnesses exists upon every trial of a disputed issue of fact." *Fisch on New York Evidence*, 2d ed. (1977), § 342, p.223. The "main and essential purpose" of the Confrontation Clause is to secure the

opportunity for cross-examination, a vital constitutional right and "the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 315-16, 320 (1974) (citations omitted). *accord People v. Gissendanner*, 48 N.Y.2d 543, 548 (1979). Impairment of a criminal defendant's cross-examination constitutes "constitutional error of the highest magnitude." *Davis v. Alaska*, 415 U.S. at 318.

In particular, "the exposure of a witness' motivation in testifying ... is a proper and important function of ... cross-examination". *id.* at 316-18, *citing Greene v. McElroy*, 360 U.S. 474, 496 (1959). *see also People v. Hudy*, 73 N.Y.2d 40, 56 (1988) (right to cross-examine and even present extrinsic proof about a witness' reason to fabricate). Indeed, "[t]he motivation of a witness in testifying, including her possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination." *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994), *citing Davis v. Alaska*, 415 U.S. at 316-17; *Greene v. McElroy*, 360 U.S. at 496. Thus, excluding examination into such bias impermissibly denies the jury information "central to assessing [the witness'] reliability". *Delaware v. Van Arsdall*, 475 U.S. 673, 677 (1986).

Finally, when considering whether the exclusion of evidence violated a defendant's right to present a complete defense, a reviewing court must consider "the

propriety of the trial court's evidentiary ruling." *Hawkins v. Costello*, 460 F.3d 238, 244(2d Cir. 2006).The New York Court of Appeals has recognized that the preclusion of competent evidence of a third party's culpability for the charged crime constitutes error as a matter of law. *People v. Primo*, 96 N.Y.2d 351, 357 (2001). Of course, admission of such evidence may not be based upon speculation or conjecture. *id*. at 356-57. But where a defendant "makes an offer of proof to the court explaining the basis for a third-party culpability defense and connecting the third party to the crime, and the probative value of the evidence plainly outweighs the dangers of delay, prejudice and confusion", the New York Court of Appeals has held that exclusion of such evidence impairs the defendant's right to a fair trial, even where it can be said that the evidence of guilt was overwhelming. *People v. DiPippo*, 27 N.Y.3d 127, 136, 142 (2016) (internal citations and quotations omitted).

Judged by the foregoing standards, it is clear that the trial court violated the appellant's right to present a complete defense. Viewing the record as a whole, it is apparent that the defense which defense counsel sought to advance was that John Kane was a cocaine dealer; that Ruth Williams was one of his customers; that Williams had incurred a debt to Kane over a cocaine purchase, and that Kane murdered Williams because of that debt. In support of that proposed defense, defense counsel advised the trial court, before the trial even started, that he intended to call

31

witnesses who would testify "that they had purchased cocaine from a drug seller by the name of John – they knew him as John Doe, but his name is John Kane" (25). At that point, it appears that the trial court did not fully understand defense counsel's reason for calling such witnesses, but responded, nevertheless, that "if Mr. Kane should deny that he committed a particular criminal act, then you may want to put on a witness with respect to that credibility issue" (27).

Defense counsel made his defense somewhat clearer during his opening statement when he told the jury that "there is evidence in this case that Mr. Kane was selling cocaine, that's why he traveled from bar to bar to bar. That is what supported his lifestyle" (338); that "it's more likely that John Kane did it than my defendant" (337), and that "every piece of evidence, scientific evidence, which you can't fudge, points to Kane" (341). And he made it clearer still when he attempted to cross-examine bartender Penny Shouse and twice asked her if she knew that Ruth Williams used cocaine, questions she was not permitted to answer because the trial prosecutor's objections were sustained (454). And when defense counsel attempted to explain that he was not asking such questions to impugn the credibility of any witness, but was actually attempting to demonstrate that there was a "drug relationship" between Kane and Williams, and that Shouse was aware of that relationship, the trial court ruled that the question of whether Kane sold cocaine to Williams was irrelevant and that such

inquiries would not be permitted (460-463). Moreover, even when defense counsel stated explicitly that to support his defense, it was "crucial" that he be permitted to probe the relationship between Shouse and Williams, as well as Shouse's awareness that "Williams got cocaine from John Kane in that time frame", the trial court agreed with the prosecutor that the subject was irrelevant and that defense counsel would therefore be precluded from asking Shouse such questions, unless he could establish that she had actually observed Williams using or possessing cocaine (472-476).

When defense counsel began his questioning of bartender Francine Quinn, the trial court restricted his cross-examination even further. Thus, when defense counsel asked Quinn if she was "present when there was an incident involving a woman who grabbed money from John Kane claiming that he had shorted here on a drug sale" (567), the trial court sustained the prosecutor's objection and expressed its frustration with defense counsel for his failure to abide by its prior admonitions (567-569). And even when defense counsel reiterated that his question was not an attempt to impugn Kane's credibility, but to show that he was Williams' drug supplier, the trial court erroneously ruled that Kane's drug dealing was a "collateral matter" and that counsel would be afforded the opportunity to call witnesses to testify about Kane's illicit activities, in the event he denied them when he testified (571-574).

33

While defense counsel may not have articulated his reasons for questioning witnesses about Kane's drug dealing as well as he might have (See Point II herein), his insistence that he was attempting to show Kane's relationship with Williams certainly should have alerted the trial court that his questions were designed to establish Kane's motive to kill Williams, not merely to impugn his credibility.  As such, the trial court's conclusion that the questions involved collateral matters was obviously flawed since the courts in New York have long held that "proof tending to establish a motive to fabricate is <u>never</u> collateral and may not be excluded on that ground".  *People v. Hudy*, 73 N.Y.2d at 56 (emphasis supplied).

Defense counsel fared no better when he attempted to elicit evidence of Kane's drug dealing and his relationship with Williams from Det. McHugh, the detective assigned to investigate the murder.  Time and again, the trial court sustained objections to defense counsel's questions as to whether the detective had investigated Kane's background or his relationship with Williams (1220-1222, 1237-1238, 1270-1271).  And even if it could be argued that the detective's answers to those questions might have constituted hearsay, the courts in New York have not hesitated to sanction the admission of such testimony as proper background information to complete the narrative of how the case was investigated.  *People v. Gross*, 26 N.Y.3d 689, 694 (2016); *People v. Dorcinvil*, 122 A.D.3d 874, 876 (2d Dept. 2014).  Moreover, the

Supreme Court has noted that while the rationale for the rule against hearsay is to exclude untrustworthy testimony, the rule should "not be applied mechanistically to defeat the ends of justice." *Chambers v. Mississippi*, 410 U.S. at 302.

It was not surprising that Kane denied selling drugs during the time period in question, while specifically denying that he sold drugs to Stephanie Domaradzki, Charles Ball and Jennifer Hartman, the individuals who had informed defense counsel's investigator that they had purchased drugs from him (1468-1471). And it was less surprising that he denied choking Hartman during an altercation in which she accused him of selling her substandard drugs (1471) since such an offense was so similar to the act that caused Williams' death. However, based on Kane's denials, and the trial court's earlier ruling that "if he [Kane] should testify differently to what your other information is, you will have an opportunity at that point on your case to cross-examine or else produce witness [sic]" (574), defense counsel certainly should have been permitted to produce witnesses to rebut Kane's denials. But that was not the case.

The trial court's ruling precluding defense counsel from calling witnesses who had purchased drugs from Kane was a textbook example of the denial of a criminal defendant's right to present a complete defense and a complete reversal of its earlier ruling that it would permit such testimony. The record reflects that after

35

the prosecution rested its case, the trial court directed defense counsel to give an offer of proof for each of the witnesses he proposed to call (1628). In response, defense counsel advised that he would call Charles Ball, who would testify that he purchased drugs from Kane (1628), Stephanie Domaradzki, who would testify that she and Ruth Williams purchased drugs from Kane (1636-1637), and Jennifer Hartman, who had informed his investigator that she purchased substandard drugs from Kane who then choked her when she attempted to reclaim her money from him (1453-1454, 1635). In each instance, the trial court ruled that the proposed testimony was collateral since it merely impeached Kane's credibility (1629-1638). These rulings were not simply erroneous evidentiary determinations. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In fact, these rulings deprived the appellant of a fundamentally fair trial. *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).

As noted, the defense in this case was that Kane was a drug dealer who had strangled and killed Williams during a drug-related dispute and then falsely accused the appellant of that crime. Moreover, support for the defense was not insubstantial. While forensic evidence conclusively established that Kane had been in Williams' apartment, such evidence was far less compelling with respect to the appellant. In addition, Kane admitted that he had engaged in sexual encounters with Williams in her apartment on several occasions and that he had gone to her apartment

36

"on various occasions not for sex" (1617). Suffice it to say, testimony that Kane was selling drugs in and around the bars in Farmingdale, Long Island; that Williams was one of his drug buying customers, and that on one occasion, Kane had choked a female customer during a dispute over the quality of the drugs he sold, would have strongly supported the appellant's defense that Kane was the real murderer since he had the motive and opportunity to commit that crime. Under the circumstances, it is fair to conclude that the trial court's erroneous rulings had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), *quoting Kotteakos v. United States*, 328 U.S. 759, 776 (1946).

Finally, even if it could be concluded that evidence of Kane's drug dealing and his relationship with Williams was collateral, which is was not, the New York rule barring such evidence nevertheless abridged the appellant's right to present a complete defense in this case. Though the New York Court of Appeals has held that the bar against admitting extrinsic evidence to contradict a witness' answers regarding collateral matters is based on "sound policy considerations" including the avoidance of "numerous collateral minitrials", *People v. Pavao*, 59 N.Y.2d 282, 289 (1983), the mechanistic application of that rule in this case infringed upon a weighty interest of the appellant and was surely "disproportionate to the purposes" the rule was "designed to serve." *Rock v. Arkansas*, 483 U.S. at 56.

37

Here, in an effort to impeach Kane's assertion that he did not sell drugs, defense counsel sought to call three witnesses, at most. Obviously, their testimony would have been confined to the question of whether Kane had sold drugs to them. There is no indication that the direct examination of those witnesses would have been lengthy. Nor does it appear that they would have been subjected to lengthy cross-examination. Thus, there was no danger that their testimony would have given rise to "numerous collateral minitrials" or that the resulting length of the trial would be outweighed by the probative value of their testimony, the concerns expressed by the New York Court of Appeals in *Pavao*. In light of those circumstances, as applied in this case, the rule barring impeachment on collateral matters was arbitrary and disproportionate because it did not rationally serve the ends it was designed to further. *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006).

In sum, the trial court's rulings precluding the appellant from cross-examining witnesses and calling witnesses to establish John Kane's drug selling activities, and the manner in which he dealt with dissatisfied customers, deprived the appellant of his constitutional right to a meaningful opportunity to present a complete defense. *Crane v. Kentucky, supra.* Moreover, the state court decision rejecting the appellant's claim was "contrary to" or an "unreasonable application" of clearly established law under 28 U.S.C. § 2254(d). The district court's order denying the

appellant's petition should therefore be reversed and the petition for a writ of habeas corpus granted.

## POINT II

THE APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BY SEVERAL KEY OMISSIONS WHICH PREVENTED THE JURY FROM CONSIDERING SIGNIFICANT EXCULPATORY EVIDENCE.

The case against the appellant, who claims actual innocence, rested almost entirely on the testimony of John Kane, an admitted alcoholic who had a sexual relationship with the victim, and whose DNA was recovered at the crime scene. In addition, Kane failed to report the murder to the police and then lied to detectives when he was first questioned about the crime. More significantly, prior to trial, defense counsel had obtained information that Kane was a drug dealer whose customers included the victim, and that on one occasion he had choked a female customer who had complained to him about the quality of the drugs he sold to her. Under the circumstances, it was imperative that defense counsel employ every available weapon at his disposal and advance every legal argument to ensure that the jury would consider all of the evidence that inculpated Kane and exculpated the

appellant. However, the record reveals that defense counsel failed to discharge those duties. As a result, the appellant was denied his Sixth Amendment right to effective assistance of counsel and his petition for habeas relief should therefore be granted.

As was discussed in Point I herein, pursuant to 28 U.S.C. § 2254(d), a federal court may only grant habeas corpus relief with respect to a claim raised in a state court if the claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Here, the clearly established law applicable to the appellant's ineffective assistance claim is the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under that standard, a claimant must satisfy a two-prong test. First, he must show that counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms. Second, he must demonstrate prejudice arising from counsel's deficient performance. *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011).

In determining whether counsel's performance was objectively unreasonable, it is of little significance that other attorneys might have performed differently. Therefore, a reviewing court must make every effort to "eliminate the

40

distorting effects of hindsight" when assessing counsel's performance. *Strickland* at 689. Accordingly, scrutiny of counsel's performance must be "highly deferential" because there is a "strong presumption that counsel's conduct falls within the wide range of professional assistance". *id*. And when applied in tandem with 28 U.S.C. § 2254(d), review of counsel's performance must be "doubly deferential". *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015), *citing Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Nevertheless, the mere incantation of the word "strategy" does not insulate an attorney's conduct from review since counsel's choice of tactics must be reasonable. *Cave v. Singletary*, 971 F.2d 1513, 1518 (11th Cir. 1992). *see also Quartararo v. Fogg*, 679 F.Supp. 212, 247 (E.D.N.Y.), *aff'd*. 849 F.2d 1467 (2d Cir. 1988) ("not all strategic choices are sacrosanct"). Moreover, the right to effective assistance of counsel may be violated "by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 486 (1986). And in the habeas context, where omissions by counsel "cannot be explained convincingly as resulting from a sound trial strategy, but instead ar[ise] from oversight, carelessness, ineptitude or laziness", a reviewing court may find "the quality of representation sufficiently deficient to grant the writ." *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).

41

The prejudice inquiry dictated by *Strickland* "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). To establish prejudice, a claimant must show that there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different". *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *id*. And in evaluating prejudice, the cumulative effect of all of counsel's errors may be considered. *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001). *see also Henry v. Scully*, 78 F.3d 51, 53 (2d Cir. 1996) (holding that the aggregate effect of counsel's omissions established ineffective assistance). Here, it is submitted that the appellant satisfies his burden of establishing that he was denied his right to effective assistance as a result of three significant failures committed by his trial counsel. Those failures will now be discussed.

A. Counsel's Failure to Argue that John Kane's
Bad Acts were Admissible to Prove His Motive
and Opportunity to Murder Ruth Williams

As was discussed in Point I herein, throughout the trial, defense counsel attempted repeatedly to elicit testimony that John Kane had sold drugs in and around the bars in Farmingdale, Long Island; that Ruth Williams had purchased drugs from

him; that he had choked a customer who was dissatisfied with the quality of the drugs she had purchased from him, and that he had even been banned from one bar because of his drug dealing activities. For the most part, defense counsel's attempts were unsuccessful because he couldn't persuade the trial court that he was seeking to introduce such evidence to establish Kane's relationship with Williams, rather than to merely impeach Kane's credibility. However, in his attempts to offer evidence of Kane's bad acts, he failed to advance the argument that such evidence was admissible under the doctrine set forth in *People v. Molineux*, 168 N.Y. 264 (1901). Defense counsel's failure to advance this argument cannot be equated with effective assistance. *Claudio v. Scully*, 982 F.2d 798, 805 (2d Cir. 1992).

More than a century ago, in *Molineux*, the New York Court of Appeals recognized that a defendant's uncharged prior bad acts could be admitted at trial, provided that the evidence was not offered to prove bad character or propensity to commit such acts. Under this rule, evidence of prior crimes or bad acts may be admitted to show (1) intent, (2) motive, (3) knowledge, (4) common scheme or plan, or (5) identity. *People v. Alvino*, 71 N.Y.2d 233, 242 (1987). Moreover, the list is merely illustrative, not exhaustive. *People v. Jackson*, 39 N.Y.2d 64, 68 (1976). Thus, the courts in New York have admitted such evidence for a variety of other purposes, so long as the evidence is relevant to some material issue, and its probative

43

value is not outweighed by its prejudicial impact. *People v. Vails*, 43 N.Y.2d 364, 368-69 (1977) (uncharged crime evidence "inextricably interwoven" with charged crime); *People v. Carter*, 77 N.Y.2d 95, 107 (1990) (uncharged crime evidence admissible to prove defendant was "acting in concert" with another); *People v. Till*, 87 N.Y.2d 835, 837 (1995) (uncharged crime evidence properly admitted to "complete the narrative of the episode").

Moreover, the admission of uncharged crime evidence in New York is certainly not limited to the defendant. Indeed, in what is sometimes referred to as a "reverse *Molineux*" proffer, the defense may introduce evidence suggesting that a third party committed the charged crime where such evidence establishes that the party committed a prior similar act which reflect a modus operandi connecting the third party to the charged crimes. *People v. DiPippo*, 27 N.Y.3d 127, 138 (2016) (finding the proffered evidence compelling and highly probative of the question of who killed the victim) (citations and quotations omitted).

Here, evidence that Kane sold drugs to Williams, and that he had choked a female customer who tried to take money back from in connection with a drug sale, was highly probative of the question of his motive and opportunity to kill Williams. Considering his admission that he had been in Williams' apartment several times prior to the murder, and that he had gone there "on various occasions not for sex"

(1617), evidence of his drug selling, particularly his sales to Williams, coupled with evidence that he choked a female drug purchasing customer, it is reasonably probable that the jury would have concluded that he was responsible for the strangling death of Williams, not the appellant. And even if the jury were not convinced that Kane was the real murderer, such evidence would almost certainly have created a reasonable doubt that the appellant was the perpetrator of that crime.

In any event, there is strong reason to conclude that if defense counsel had explained to the trial court that his purpose in offering evidence of Kane's bad acts was to show his motive and opportunity to murder Williams, the evidence would have been admitted. Instead, defense counsel repeatedly argued that the evidence should be admitted to show Kane's "relationship" to Williams, a somewhat nebulous concept, which the trial court continually misinterpreted as an attempt to merely impugn Kane's credibility. In short, while defense counsel may have been persistent and even zealous in his conduct of the defense, his failure to advance the most cogent and appropriate legal argument in support of the evidence he sought to introduce supports the conclusion that such failure was the result of a fundamental lack of understanding of the legal issues applicable to the appellant's case. *Cornell v. Kirkpatrick*, 665 F.3d 369, 379-80 (2d Cir. 2011). Under the circumstances, defense counsel's omission "cannot be viewed objectively as sound trial strategy". *id.*, *citing*

45

*Cox v. Donnelly*, 432 F.3d 388, 390-91 (2d Cir. 2005). Thus, it follows that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008).

B. Counsel's Failure to Argue that Excluding
Evidence of John Kane's Bad Acts Violated
Appellant's Right to Present a Complete Defense

As was discussed at length in Point I herein, the trial court's exclusion of evidence of John Kane's drug dealing and violent behavior deprived the appellant of his fundamental right to present a complete defense. And as was discussed in Point I(A) herein, defense counsel's inability to introduce that evidence stemmed from his failure to advance a pointed legal argument to support the admission of that evidence. In addition, it appears that defense counsel failed to advance or even recognize the most fundamental legal basis to justify admitting Kane's bad act evidence – the constitutional right to present a complete defense. This failing also denied the appellant his Sixth Amendment right to effective assistance of counsel.

The New York Court of Appeals has recognized that while the right to cross-examine witnesses and present a defense is not absolute, "any law circumscribing the ability of the accused to defend against criminal charges remains subject to limitation by constitutional guarantees of due process and the right to confront the prosecution's witnesses." *People v. Williams*, 81 N.Y.2d 303, 312-13

46

(1993), *citing* U.S. Const. 5th, 6th Amends; *Pointer v. Texas*, 380 U.S. 400 (1965);
*Washington v. Texas*, 388 U.S. 14 (1967). At the same time, however, the courts in
New York require that all claims, including those of a constitutional nature, be raised
in a timely manner so that the trial court has the "opportunity to correct any error ...
at a time when the issue can be dealt with most effectively." *People v. Lopez*, 71
N.Y.2d 662, 665 (1988).

In this case, defense counsel repeatedly sought to introduce evidence of
Kane's bad acts on the grounds that such evidence established his relationship with
Williams. In advancing this argument, he stressed the importance of this evidence to
the appellant, stating, at one point, that it was "part and parcel of this entire case"
(572). However, he failed to provide the trial court with a coherent explanation as to
why the evidence was so important. Moreover, he never even hinted that the basis
for admitting the evidence was the appellant's constitutional right to present a
defense, one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410
U.S. 284, 294 (1973). Accordingly, his attempts to introduce the evidence were
repeatedly rejected because he failed to alert the trial court to the fundamental
importance of that evidence and the impact its exclusion would have on the
appellant's constitutional right to present a complete defense. *Crane v. Kentucky*, 476
U.S. 683, 690 (1986).

In sum, there was no sound strategic reason for defense counsel's failure to argue that excluding evidence of Kane's bad acts violated the appellant's right to present a complete defense. This failure further compromised the appellant's Sixth Amendment right to effective assistance of trial counsel.

### C. Counsel's Failure to Argue that the Trial Court Should Have Admitted the Appellant's Statement to a Police Officer In Toto

On October 18, 2000, approximately six months after Ruth Williams was murdered, and about five months after the appellant had been arrested for her murder and released on bail, the police received a phone call from the appellant regarding a vagrant whom he claimed was harassing his wife. P.O. Pamela Stark, the officer who had discovered Williams' body on April 12, 2000, responded to the appellant's phone call. During their ensuing conversation, the appellant talked about the events leading up to Williams' murder and stated that he had not committed the crime; that while they were in the Y.L. Childs bar, Williams had whispered to him that "she wanted drugs from Kane"; that Kane was a drug dealer who didn't "give any away for free"; that Kane had killed Williams because she expected him to give her drugs, even though she had failed to satisfy him sexually when she had performed oral sex on him, and that when he was first questioned by the police, he hadn't mentioned Kane

48

"because of the drugs".[3]

Prior to calling P.O. Stark to the stand, the prosecutor informed the trial court that he intended to elicit portions of the statement the appellant had made to her, but that he would redact those portions he considered to be "self-serving" and "hearsay" (1380-1382). When defense counsel was asked for his response to the prosecutor's proposal, he stated that he objected to it because "anything that occurs in this case ... should be fair game here. It's cumulative. If he's bringing in this statement ... I think he has to take the wheat with the chaff" (1382). The trial court disagreed with defense counsel's "cumulative" argument, but refrained from ruling on the issue until P.O. Stark testified (1382-1383).

On direct examination of P.O. Stark, the prosecutor did not elicit from her the portions of the appellant's statement in which he told her that "he was out [on bail] because of no evidence on him, all comes back to Kane, even a cigarette butt found under her"; that he believed that "Ruthie gave John a blow job he didn't cum – she still wanted drugs/coke – so he killed her"; that "he was offered Manslaughter but turned it down"; that the Homicide detectives made a mistake but they gave Kane immunity to testify against me. The det[ectives] are waiting for Kane to lie on the

---

[3]A copy of a memo in which P.O. Stark detailed her October 18, 2000 conversation with the appellant and forwarded to the Nassau County Police Department Homicide Division, is included in the Appendix submitted herewith (A4-A7).

stand and then, no more immunity"; that Kane was no longer living in Farmingdale and was "out east living with his father" and that he ended the conversation by telling the officer, "Thanks for listening" (1407-1409). On cross-examination, when defense counsel asked P.O. Stark if the appellant had told her "anything else about ... the crime", the prosecutor objected (1415). At the ensuing sidebar, defense counsel argued that even though the omitted statements were "self-serving", he didn't think the prosecutor "should be allowed to pick and choose portions of a statement that reflect what was in the defendant's mind without the defense being allowed to introduce statements that would make that more explainable" (1416). The trial court then sustained the prosecutor's objection and sustained similar objections when defense counsel attempted again to elicit the omitted portions of the appellant's statement (1418-1422).

It is submitted that in failing to make a proper argument that the trial court should permit the appellant's statement to P.O. Stark to be admitted in toto, or not at all, defense counsel's performance fell below an objective standard of reasonableness. And that failure provides further support for a finding that the appellant was denied his Sixth Amendment right to effective assistance of counsel.

One of the most ancient evidentiary rules in New York provides that "[w]here use is made in a judicial proceeding of a prior declaration the entire

declaration at the time made so far as relevant must be taken together; a party may not utilize only so much of the declaration as is for his benefit, but he must also admit that which is against his interest and the whole must stand or fall together". *People v. Gallo*, 12 N.Y.2d 12, 15 (1962), *quoting People ex rel. Perkins v. Moss*, 187 N.Y. 410, 428 (1907). This rule, which is sometimes referred to a "the rule of completeness", is grounded in simple fairness and recognizes that "a defendant is entitled to have both the inculpatory and exculpatory portions of a statement introduced into evidence by the People, placed into evidence." *People v. Rodriguez*, 188 A.D.2d 566, 567 (2d Dept. 1992), *citing People v. Dlugash*, 41 N.Y.2d 725 (1977).

In this case, the prosecutor plainly violated the "rule of completeness" when he selectively introduced portions of the appellant's statement to P.O. Stark. He elicited portions of that statement which tended to corroborate the testimony of his other witnesses which revealed that he was observed in intimate proximity to Williams at the Y.L. Childs bar; that he had purchased cigarettes and beer on the morning in question, and that he had expressed concern that his wife would be angry at him for staying out as late as he did that morning. Most significantly, the prosecutor omitted the portion of the statement in which the appellant said that he believed that Williams had performed oral sex on Kane in exchange for drugs; that

51

Kane did not ejaculate during the encounter, and that the fatal confrontation occurred when Williams demanded that Kane give her the drugs she'd been hoping to obtain even though she had not satisfied him sexually.

Regardless of whether the appellant's belief as to how and why Williams was murdered was true (and there is actually good reason to believe that the scenario he described was true), once the prosecutor determined that he was going to introduce the statement in evidence, he was required to introduce it in toto, or not at all. *People v. Gallo, supra*. By excising the portion of the statement in which the appellant described the most likely scenario surrounding Williams' murder, the prosecutor withheld from the jury the most exculpatory portion of that statement. *People v. Pitt*, 84 A.D.3d 1275, 1277 (2d Dept. 2011). And of course, the prosecutor exploited his use of the redacted statement when he argued in summation that the statement was a "charade" (1763-1765); that it represented a substantial change in the appellant's "story", and that it contributed to "a mountain of evidence" against him (1776).

A competent attorney would have recognized that the prosecutor's offer of portions of the appellant's statement violated the "rule of completeness" and that the statement should either be admitted in toto, or not at all. But defense counsel seemed unprepared to deal with the issue. When confronted with the prosecutor's plan, he argued, somewhat nonsensically, that the statement was "cumulative", and

52

that "I think he has to take the wheat with the chaff" (1382). These arguments scarcely alerted the trial court to the legal issue raised by the prosecutor's planned redaction. Under the circumstances, defense counsel's failure to present a cogent argument opposing admission of the redacted statement fell below an objective standard of reasonableness under prevailing professional norms. *Strickland* at 688.

Finally, the appellant was prejudiced by defense counsel's deficient performance. *Henry v. Poole*, 409 F.3d 48, 71 (2d Cir. 2005). By failing to present the trial court with appropriate legal argument that evidence of Kane's bad acts was admissible to prove his motive and opportunity to murder Williams, and that excluding such evidence would deny the appellant his fundamental right to present a complete defense, defense counsel deprived the jury of the opportunity to conduct a full and fair assessment of Kane's testimony, which would have been seriously undermined if the evidence were admitted. *Gersten v. Senkowski*, 426 F.3d 588, 613 (2d Cir. 2006). Moreover, his failure to prevent the prosecutor from redacting the portion of the appellant's statement to P.O. Starks in which he provided a plausible basis for finding that Kane had murdered Williams, deprived the appellant of the opportunity to present compelling exculpatory evidence that might well have altered the jury's determination of the case. And in a case where the evidence of the appellant's guilt was fairly underwhelming, even a relatively small quantity of

53

prejudice is sufficient to undermine confidence in the judgment of conviction. *Pavel v. Hollins*, 261 F.3d 210, 226 (2d Cir. 2001).

In sum, the appellant was denied his Sixth Amendment right to effective assistance of trial counsel and there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. And since the state court's rejection of his ineffectiveness claim involved an unreasonable application of clearly established Federal law or was based on an unreasonable determination of the facts in light of the evidence presented at trial, the district court's order denying the appellant's petition should be reversed and the petition for a writ of habeas corpus granted.

<u>CONCLUSION</u>

For all of the reasons stated herein, the district court's order denying the appellant's petition for a writ of habeas corpus should be reversed and the writ granted.

Respectfully submitted,

RANDALL D. UNGER
**Attorney for Petitioner-Appellant**
**Paul Scrimo**
42-40 Bell Boulevard, Suite 302
Bayside, New York 11361
(718) 279-4500

Dated:    Bayside, New York
          June 12, 2018

<u>CERTIFICATION</u>

Pursuant to Rule 32 (a) (7) (B)

RANDALL D. UNGER, ESQ., counsel for petitioner-appellant, certifies that the foregoing petitioner-appellant's brief complies with the type-volume limitations set forth in FRAP 32 (a) (7) (B) in that it contains 12,859 words.

Dated:      Bayside, New York
            June 12, 2018

                        _____

                        RANDALL D. UNGER